| | |
|---|---|
| DARREN DOLCETTI,<br>    *Plaintiff*,<br>    v.<br><br>NANCY A. BERRYHILL, ACTING<br>COMMISSIONER OF THE SOCIAL<br>SECURITY ADMINISTRATION,<br>    *Defendant*. | No. 3:17-cv-1820 (VAB) |

**RULING AND ORDER ON MOTION TO REVERSE THE DECISION OF THE COMMISSIONER AND MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER**

Darren Dolcetti filed a Social Security disability insurance benefit claim under Section 205(g) of the Social Security Act, as amended by 42 U.S.C. § 405(g), which was denied.

Mr. Dolcetti has now filed a motion to reverse the decision of the Administrative Law Judge ("ALJ"). Motion to Reverse the Decision of the Commissioner, ECF No. 19 ("Mot. to Reverse").

In response, Nancy A. Berryhill, Acting Commissioner of the Social security Administration (the "Commissioner"), has moved to affirm the ALJ's decision. Motion to Affirm the Decision of the Commissioner, ECF No. 20 ("Mot. to Affirm").

For the following reasons, the Court **GRANTS** Mr. Dolcetti's motion to reverse the decision of the Commissioner and **DENIES** the Commissioner's motion to affirm.

The Court also **REMANDS** the case solely for the calculation and payment of benefits.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

A.      **Factual Allegations**

Before April 2014, Mr. Dolcetti worked as an entertainment accountant for NBC

Universal, LLC. Social Security Transcripts by Social Security Administration, ECF No. 16

("Tr."), at 48, 96. He enjoyed playing golf, skiing, athletics, jazz piano, and writing screenplays.

*Id.* at 49.

On the morning of April 14, 2014, Mr. Dolcetti went to his office to work on a project.

*Id.* at 52. While there, his office slowly began to flood with exhaust smoke. *Id.* at 53. Mr.

Dolcetti "started getting extremely tired" and then he experienced nausea and blurred vision. *Id.*

at 51–52. When he walked out of his office, it was full of smoke. *Id.* at 53.

As Mr. Dolcetti's condition worsened, his father and mother took him to the hospital. *Id.*

at 76. In the emergency room, he reported "distractibility, forgetfulness, organization/sequencing

problems, spaciness, mental slowing, blurred vision, paresthesias and nausea." *Id.* at 577

(internal quotation marks omitted). He remained in the hospital for four days with a diagnosis of

carbon monoxide poisoning. *Id.* at 221.

### 1.    Medical History

On October 20, 2014, Herbert Walter Reiher, M.D. examined Mr. Dolcetti and diagnosed

him with carbon monoxide poisoning, headaches, and dizziness. Tr. at 563. Dr. Reiher

determined that Mr. Dolcetti had postural limitations due to carbon monoxide poisoning,

"producing moderate limitations with climbing, stooping, bending, crawling, kneeling,

crouching, and reaching." *Id.* While Mr. Dolcetti did not have "vision, hearing, or speech

limitations," *id.*, he did have "environmental limitations of heights which could produce

decreased balance, and exposure to loud noise, bright lights and computer screens, which could

precipitate a headache." *Id.*

On October 21, 2014, another doctor, Jeffrey S. Cohen, M.D. examined Mr. Dolcetti and

determined that his "[h]istory of carbon monoxide poisoning suggest[ed] a mild neurocognitive

event, migraine headaches, and reported history of attention deficit hyperactivity disorder." Tr. at 573. Dr. Cohen found that Mr. Dolcetti "appear[ed] to be making very steady and graduated improvements in his overall level of intellectual and cognitive performance." *Id.* at 567. According to Dr. Cohen, Mr. Dolcetti reported "that pain dominates his critical picture. He feels it is causing impairments in his ability to adjust and recover. He spoke about difficulty with repetitive backaches and headaches, difficulty with vision, and headaches have become an extreme part of his difficulties." *Id.* at 571. Dr. Cohen also observed that "Mr. Dolcetti continues to experience impairments in migraine headaches, concentration, and fatigue," which required "a temporary period of rest and ongoing therapies to help him make steady improvements. However, he [was] most likely going to return to a usual level of cognitive and intellectual performance." *Id.* at 572.

From November 11 until November 25, 2014, Svenja Wacker, Ph.D. conducted a neuropsychological evaluation of Mr. Dolcetti. Tr. at 577. During the sessions, Dr. Wacker noted Mr. Dolcetti's "mildly disconjugate gaze, intermittent nystagmus and poor balance." *Id.* at 578.[1] Although Mr. Dolcetti was alert and aware with a linear thought process, his "focus deteriorated rather quickly with reports of fatigue, headache and increasing difficulties with sustained cognitive demands." *Id.* Dr. Wacker similarly noted that Mr. Dolcetti had general intellectual functioning in the superior range, but continued difficulties sustaining concentration over time after a period of focused cognitive output suggested significant susceptibility to fatigue. *Id.* at 581. This led to brief sessions that Dr. Wacker stopped when Mr. Dolcetti showed

---

[1] "A disconjugate gaze means that the eyes are not paired in action or joined together." *See A.R.M. ex rel. Morlock v. Astrue*, Civil No. 12–cv–322 (DWF/SER), 2013 WL 785627, at *4 n. 10 (D. Minn. Jan. 10, 2013) (citing *Stedman's Medical Dictionary*, Disconjugate, (27th ed 2000)). Nystagmus is defined as "an involuntary rapid movement of the eyeball, which may be horizontal, vertical, or rotary. An inability of the eyes to maintain visual fixation as they are turned from side to side (in other words, jerking or bouncing) is known as horizontal gaze nystagmus, or HGN." *See United States v. Van Hazel*, 468 F. Supp. 2d 792, 795–96 (E.D.N.C. 2006).

deterioration. *Id.* As a result, Dr. Wacker suggested that Mr. Dolcetti only sustain high levels of cognitive output for "time-limited intervals in a quiet and distraction-free environment, not exceeding 45 to 60 minutes" and only schedule work "during his most alert times of the day and should be followed by periods of brain rest." *Id.* at 582. After the exam, Dr. Wacker concluded that "full-time work and commuting are not recommended at this time." *Id.*

As late as July 18, 2016, Dr. Wacker noted that Mr. Dolcetti's "difficulties include problems with attention and short-term memory, poor frustration tolerance, irritability, depression, mood swings, decreased libido, limited ability to function in busy, overstimulating environments, visual- and balance problems and persistent headaches." Tr. at 114–15. Dr. Wacker observed that Mr. Dolcetti no longer used a cane, "but remain[ed] quite unsteady and wide-based in his gait." *Id.* at 115. Mr. Dolcetti also continued to display a "mildly disconjugate gaze, photophobia, intermittent nystagmus and poor balance." *Id.*

He also continued to have "sound concentration toward the beginning of each session," but "his focus deteriorated rather quickly with sustained cognitive demands of lengthy testing sessions." *Id.* While Mr. Dolcetti was able to learn, and retain new information, reason abstractly, and problem solve quickly, his cognitive performance "remain[ed] significantly impacted by time of day, pain level and length of time sustained focus is required, with much poorer cognitive output during afternoon sessions and toward the end of sessions." *Id.* at 118. Dr. Wacker suggested that Mr. Dolcetti "continue engagement in work-related tasks for time-limited intervals in a quiet and distraction-free environment, not exceeding 60 to 120 minutes at a time." *Id.* In short, "[c]entral nervous system compromise leaves him easily overstimulated and vulnerable to fatigue with limited attentional services," so a "[r]eturn to full-time work and commuting was not appropriate for Mr. Dolcetti." *Id.* at 119.

On September 30, 2016, Michael Daras, M.D., Mr. Dolcetti's treating physician since May 14, 2014, recognized the continuing effects of Mr. Dolcetti's exposure to carbon monoxide, which the physician diagnosed as encephalopathy, a disease affecting the brain. Dr. Daras noted that Mr. Dolcetti rated a "0" for number of hours in an eight-hour work day Mr. Dolcetti could stand or walk. Tr. at 642. He also determined that Mr. Dolcetti had significant environmental limitations, due to his impairment, related to height, chemicals, fumes, moving machinery, temperature extremes, and vibrations. *Id.* at 643.

Dr. Daras further characterized Mr. Dolcetti's prognosis as "guarded" and expected Mr. Dolcetti's impairment to last at least twelve months. *Id.* Due to Mr. Dolcetti's "[p]oor concentration and cognitive function after prolonged activity," Dr. Daras noted that he would have difficulty working at a regular job on a regular basis. *Id.* at 647. More specifically, he rated Mr. Dolcetti's capacity to handle the mental abilities and aptitude needed to do unskilled work as "poor" in the following areas: remembering work-like procedures, maintaining attention for two-hour segments, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, responding appropriately to changes in a routine work setting, dealing with normal work stress, being aware of normal hazards and taking appropriate precautions. *Id.* at 649. In support of these findings, Dr. Daras referred to neuropsychological testing performed on Mr. Dolcetti, and noted his decreased performance on these measures over time. *Id.* at 650.

### 2. Disability Applications

On August 28, 2014, Mr. Dolcetti applied for disability insurance benefits under the Social Security Act. Complaint, ECF No. 1 ("Compl."), at ¶ 5.

On November 12, 2014, the Commissioner denied Mr. Dolcetti's application. *Id.* The Commissioner determined that Mr. Dolcetti suffered severe migraines and spine disorders that caused a mild restriction in daily living, mild difficulties in maintaining social functioning, and mild difficulties in keeping concentration, persistence, or pace. Tr. at 219–20. The Commissioner determined that Mr. Dolcetti could occasionally lift up to fifty pounds, frequently lift up to twenty-five pounds, stand or walk for about six hours of an eight-hour workday, and did not have any limits on the operation of hand or foot controls. *Id.* at 221. The Commissioner concluded that Mr. Dolcetti could climb ramps or stairs occasionally, should never climb ladders, ropes, or scaffolds, occasionally balance, and could frequently stoop, kneel, crouch, or crawl. *Id.* at 222. As a result, the Commissioner concluded that Mr. Dolcetti was not disabled. *Id.* at 224.

On November 24, 2014, Mr. Dolcetti moved for reconsideration of the Commissioner's decision. Tr. at 226. On April 28, 2015, the Commissioner denied Mr. Dolcetti's reconsideration request. Compl. at ¶ 6; Tr. at 237. In the Commissioner view, the carbon monoxide cognitive impairment had not gotten worse. Tr. at 233. The Commissioner also made the same exertion and limitation determinations as Mr. Dolcetti's original disability determination. *Id.* at 235–36.

On May 14, 2015, Mr. Dolcetti requested a hearing. Compl. at ¶ 7; Tr. at 251.

On October 31, 2016, ALJ Eskunder Boyd heard Mr. Dolcetti's claims. Compl. at ¶ 8. At the hearing Mr. Dolcetti wore sunglasses because of his light sensitivity. Tr. at 62.

### 3.    Witness Testimony

Mr. Dolcetti testified that he does not use any assisted walking device, unless he is having issues with depth perception and balance, that he can read the newspaper for short periods of time before his vision starts to blur, that he could do simple math with some mistakes, and that he could write for about a half hour before needing to take a break. Tr. at 46–47. Mr. Dolcetti

also testified as to not functioning outside of the house very well or doing many household chores within it, but being able to groom, bathe, and cook for himself and his daughter, as well as care for his pets. *Id.* at 48–49. He does not do any laundry or grocery shopping. *Id.* at 50. Mr. Dolcetti testified that he had enough credits to graduate college. *Id.* at 46–47.

During a normal day, Mr. Dolcetti wakes up, takes his medications, lets his dogs out, and then makes his daughter's breakfast. *Id.* at 50. Mr. Dolcetti testified that he is best in the morning but begins to experience cognitive decline as he becomes fatigued, which causes him to need rest throughout the day. *Id.* at 57, 65. Mr. Dolcetti also tries to avoid certain smells, sound, light, movement, or stressful situations because too much stimuli can trigger a loss of depth perception, cognitive functioning, lack of retention, inability to speak, and headaches. *Id.* at 51, 70.

Mr. Dolcetti testified as to not being able to read longer than thirty or forty minutes before he starts having trouble focusing. *Id.* at 55. His ability to follow some television or movies depends on the day. *Id.* at 59. He no longer drives because of his reactions to light and sound. *Id.* at 62. Although Botox injections every six weeks and use of Gabapentin limit the severity of his headaches, Mr. Dolcetti still regularly has debilitating headaches that require him to spend up to an hour in a dark room to recover. *Id.* at 54, 63. Mr. Dolcetti testified needing to be alone because of overstimulation between two and three times per week. *Id.* at 63.

Mr. Dolcetti's father testified that his long- and short-term memory had become limited, and Mr. Dolcetti's wife and father do most of his paperwork. *Id.* at 72. Mr. Dolcetti's father also testified that light and loud noises hinder Mr. Dolcetti's ability to interact with his family. *Id.* at 74–75. Finally, his father testified that there was a definitive difference between Mr. Dolcetti before and after his carbon monoxide poisoning. *Id.* at 76, 77–78.

### 4.    Vocational Expert Testimony

At the administrative hearing, Michael Durval testified as a vocational expert. Tr. at 79. Mr. Durval acknowledged that someone with Mr. Dolcetti's medical history should not perform any balancing, work with heights or hazards, and should avoid concentrated exposure to pulmonary irritants, but could perform simple, routine, and repetitive tasks. *Id.* at 81. With the added limitations of only being able to work for two-hour segments, inability to have extended interaction with co-workers or the public, and issues with depth perception, someone in Mr. Dolcetti's medical position would be able to work as a laundry worker, a stock laborer, or an assembler of small products. *Id.* at 81–85.

Mr. Durval also testified that there were several possible full-time employment limitations for someone in Mr. Dolcetti's position. When the ALJ asked Mr. Durval whether an inability to keep concentration, pace, and persistence for two-hour segments would be a disqualifying factor for full-time work, Mr. Durval responded that this would be a hindrance regardless of the sound, light, or exertional levels. *Id.* at 86. When asked about a potential absenteeism rate of three or four days per month, Mr. Durval testified that sort of absenteeism would rule out any full-time work, regardless of any other limitations. *Id.* at 86–87.

When asked whether fluorescent lighting as a vocational limitation would limit the work available to someone, Mr. Durval responded that a fluorescent light limitation would eliminate work in most workplaces and the suggested hypothetical professions already listed. *Id.* at 88. When asked whether an employee that regularly needed a one-hour break separate from regularly scheduled break times would be able to work full-time, Mr. Durval responded that someone in that position would not be employable for any job on a full-time basis. *Id.* Finally, when asked if someone with an impairment causing them to be off task at least fifteen percent of

the workday would be able to work full-time, Mr. Durval testified that such a person would be unemployable on a full-time basis. *Id.* at 89.

### 5. ALJ Decision

On January 23, 2017, the ALJ found that Mr. Dolcetti was disabled from April 4, 2014 until January 1, 2016, but that his disability ended on January 2, 2016. Tr. at 28. The ALJ made seventeen factual and legal conclusions:

1. Mr. Dolcetti met the insured status requirements of the Social Security Act through December 31, 2019. *Id.* at 17.

2. Mr. Dolcetti had not engaged in substantial gainful activity since April 4, 2014. *Id.*

3. Between April 4, 2014 and January 1, 2016, Mr. Dolcetti suffered from "Carbon Monoxide Exposure and Sensory Neuropathy," which were severe within the meaning of the regulations and limited Mr. Dolcetti's "ability to perform basic work activities" under 20 CFR 404.1520(c). *Id.*

4. Between April 4, 2014 and January 1, 2016, Mr. Dolcetti did not have an impairment or combination of impairments that met or medically equaled the severity of a neurocognitive impairment under 20 CFR, Part 404, Subpart P, Appendix 1, Listing 12.02. *Id.* at 17–19.

5. Between April 4, 2014 and January 1, 2016, Mr. Dolcetti had the residual functional capacity to perform work at all exertional capacities with little to no changes in work duties, so long as Mr. Dolcetti avoids balancing, heights, or hazards, Mr. Dolcetti does not work in a field that requires depth perception, Mr. Dolcetti would have brief interactions with others, and Mr. Dolcetti limits concentration to two-hour segments. *Id.* at 19–21.

6. Beginning January 2, 2016, Mr. Dolcetti had the residual functional capacity to perform work performing simple and repetitive tasks with little to no changes in work duties, so long as Mr. Dolcetti avoids balancing, heights, or hazards, Mr. Dolcetti avoids moderate exposure to pulmonary irritants, Mr. Dolcetti avoids work requiring depth perception, Mr. Dolcetti limits his concentration to two-hour segments, Mr. Dolcetti only has superficial interactions with public, and Mr. Dolcetti avoid exposure to moderate sound. *Id.* at 21–24.

7. From April 4, 2014 until January 1, 2016, Mr. Dolcetti has been unable to perform his prior work as an accountant or a bar manager. *Id.* at 24–25.

8. Mr. Dolcetti is a younger individual for disability considerations. *Id.* at 25.

9. Mr. Dolcetti has a high school education and can speak English. *Id.*

10. Mr. Dolcetti's acquired job skills do not transfer to other occupations within the residential functional capacity under 20 CFR 404.1568. *Id.*

11. From April 4, 2014 until January 1, 2016, there were no jobs within the national economy that Mr. Dolcetti could have performed given his residual functional capacity. *Id.* at 25–26.

12. Beginning on January 2, 2016, there were jobs as a laundry worker, stock labeler, and assembler that existed in significant numbers in the national economy that Mr. Dolcetti could have performed given his residual functional capacity. *Id.* at 26–27.

13. Under the Social Security Act, Mr. Dolcetti was disabled from April 4, 2016 until January 1, 2016. *Id.* at 27.

14. Mr. Dolcetti's condition was expected to and did improve over time. *Id.*

15. Mr. Dolcetti acknowledged his own medical improvement, including his walking,

visual performance, memory, and information processing. *Id.* at 27–28.

16. The ALJ found that there was no evidence that Mr. Dolcetti's disability had not

  ended. *Id.* at 28.

17. Mr. Dolcetti's disability ended on January 2, 2016, and he has not become disabled

  since that time. *Id.*

### 5.   Appeals Council Decision

The Appeals Council "found no reason under our rules to review the Administrative Law Judge's decision," and denied Mr. Dolcetti's request for review. Tr. at 1. The Appeals Council found that the ALJ did not abuse his discretion, there was no error of law, substantial evidence supported the decision, and the ruling did not impact the public interest. *Id.*

### B.   Procedural History

On October 31, 2017, Mr. Dolcetti filed a Complaint against the Commissioner to appeal the ALJ decision. Compl.

On August 20, 2018, the Commissioner filed her Answer to Mr. Dolcetti's Complaint. Answer with Transcripts, ECF No. 17.

On October 16, 2018, Mr. Dolcetti moved to reverse the Commissioner's decision. Mot. to Reverse.

On December 18, 2018, the Commissioner moved to affirm the ALJ's decision. Mot. to Affirm.

## II.   STANDARD OF REVIEW

Under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than [twelve] months." *Smith v. Berryhill*, 740 F. App'x.

721, 722 (2d Cir. 2018) (summary order) (citing 20 C.F.R. § 404.1505(a)).

To determine whether a claimant is disabled, the ALJ must follow a five-step evaluation

process:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2)
> whether the claimant has a severe impairment or combination of impairments; (3)
> whether the impairment meets or equals the severity of the specified impairments
> in the Listing of Impairments; (4) based on a "residual functional capacity"
> assessment, whether the claimant can perform any of his or her past relevant work
> despite the impairment; and (5) whether there are significant numbers of jobs in the
> national economy that the claimant can perform given the claimant's residual
> functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117,

120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v)). "[T]he claimant

has the general burden of proving that he or she has a disability within the meaning of the Act,

and bears the burden of proving his or her case at steps one through four," *see Burgess*, 537 F.3d

at 128 (internal quotation marks and citation omitted), with Step Five "the burden shift[ing] to

the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc.*

*Sec. Admin.*, 683 F.3d 443, 445 (2d Cir. 2012).

"A district court reviewing a final . . . decision [of the Commissioner of Social Security]

pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an

appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "In reviewing a

final decision of the SSA, this Court is limited to determining whether the SSA's conclusions

were supported by substantial evidence in the record and were based on the correct legal

standard." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. §

405(g)). A district court can reverse the commissioner's decision "only if it is based upon legal

error or if the factual findings are not supported by substantial evidence in the record as a

whole." *Greek v. Colvin*, 802 F.3d 370, 374–75 (2d Cir. 2015).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brown v. Apfel*, 174 F.3d 59, 61 (2d Cir. 1999) (internal quotation marks omitted) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). While the standard is deferential, "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay*, 562 F.3d at 507 (internal quotation marks and citations omitted). "[A district court] must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Petrie v. Astrue*, 412 F. App'x. 401, 403–04 (2d Cir. 2011) (summary order) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)) (internal quotation marks omitted).

To determine "whether the agency's findings are supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)). When "the Commissioner's decision applies the correct legal principles and is supported by substantial evidence, that decision will be sustained." *Kumar v. Berryhill*, 3:16-cv-1196 (VLB), 2017 WL 4273093, at *4 (D. Conn. Sept. 26, 2017) (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)).

## III.  DISCUSSION

### A.  Support for Medical Improvement Finding

An ALJ has an "affirmative duty to compile a complete record" when ruling on eligibility. *Brown*, 174 F.3d at 63. The ALJ must "not only develop the proof but carefully weigh it." *Donato v. Sec'y. of Dep't. of Health and Human Servs.*, 721 F.2d 414, 419 (2d Cir. 1983). Accordingly, the district court conducts "a plenary review of the administrative record to determine whether, considering the record as a whole, the Commissioner's decision is supported by substantial evidence." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw*, 221 F.3d at 131 (quoting 42 U.S.C. § 405(g)). In cases "[w]here the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," the district court will not substitute its "judgment for that of the commissioner." *Veino*, 312 F.3d at 586. And the district court may not "affirm an administrative action on grounds different from those conducted by the agency." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).

Mr. Dolcetti argues that the ALJ wrongly concluded that medical improvement occurred as of January 2, 2016. Mot. to Reverse at 21. In his view, the ALJ incorrectly applied the relevant legal standard and then improperly determined that Mr. Dolcetti's disability had ended. *Id.* Under the correct legal standard, in his view, once there is a disability finding, there is a presumption of continuing disability until the Commissioner produces evidence sufficient to rebut that presumption. *Id.* at 22. Mr. Dolcetti argues that the record does not show that his slow improvement ended his disability—let alone that the Commissioner has offered evidence in

14

support of that conclusion. *Id.* at 22–23.

In response, the Commissioner argues that the ALJ correctly applied the medical improvement standard to conclude that Mr. Dolcetti's disability ended. Thus, Mr. Dolcetti should not have been—and was not—entitled to a presumption of disability and the record evidence reflected medical improvement to the point where Mr. Dolcetti was no longer disabled after January 2, 2016. Mot. to Affirm at 6. In the Commissioner's view, the ALJ extensively recounted the applicable law and facts, with the weight of the evidence pointing toward Mr. Dolcetti's medical improvement. *Id.* Because he did not later become disabled after reaching medical improvement and showed improved neuropsychological testing, the Commissioner argues that Mr. Dolcetti can work in unskilled jobs that only require two-hour blocks of attention. *Id.* at 6–8.

The Court disagrees.

Under the Social Security regulations, a claimant already determined to be disabled may show medical improvement to render the claimant no longer disabled, when substantial evidence proves medical improvement in the impairments and the individual is now able to engage in substantial gainful activity. *See* 42 U.S.C. § 423(f)(1). These regulations define medical improvement as "any decrease in the medical severity" of impairments "which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." *See* 20 C.F.R. §404.1494(b)(1). Thus, "in order to 'determin[e] whether medical improvement has occurred,' the SSA must compare 'the current medical severity of th[e] impairment [] . . . to the medical severity of that impairment [] at th[e] time' of the most recent favorable medical decision." *Veino*, 312 F.3d at 586–87 (citing 20 C.F.R. § 404.1594(b)(7)).

Here, however, the ALJ's conclusion is based on the expectation of improvement during

testing and not actual medical evidence that Mr. Dolcetti's impairments improved. In the administrative opinion, the ALJ cites evidence that Mr. Dolcetti's examiners expected him to improve and various treatment notes that note improvement in his walking, movement, and decreased frequency of debilitating headaches. *See* Tr. at 27–28 (citing April 4, 2014 hospital records, May 19, 2014 physical therapy records, October 2014 treatment records, and November 2014 treatment records). But these medical records are all from the period when the ALJ ruled Mr. Dolcetti disabled. *See id.* As a result, the ALJ has not made the necessary comparison between the current medical severity of Mr. Dolcetti's condition and the medical severity at the time of the "most recent favorable medical decision," as the Second Circuit's decision in *Veino* requires. *See Veino*, 312 F.3d at 586–87 (citing 20 C.F.R. § 404.1594(b)(7)).

In other words, there is not substantial evidence in the record that the ALJ met its required burden. Accordingly, the Court reverses the Commission's administrative decision and remands the case for further proceedings. *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) (finding that when there is a reasonable basis to doubt the ALJ applied the correct legal principles, the Court "cannot be certain whether or not the Commissioner's ultimate conclusion that plaintiff was not disabled is supported by substantial evidence").

### B.    Treating Physician Rule

The treating physician rule gives "deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). Under this rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R.

§ 404.1527(d)(2)); *see also Greek*, 802 F.3d at 375. Failure to provide "'good reasons' for not crediting the opinion of a claimant's treating physician" can be a basis for remand. *Id.* at 129–30 (quoting *Snell*, 177 F.3d at 133).

As to the nature and severity of a claimant's impairments, "[t]he SSA recognizes a rule of deference to the medical views of a physician who is engaged in the primary treatment of a claimant." *Greek*, 802 F.3d at 375; *see also Burgess*, 537 F.3d at 128. The treating physician's opinion "is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (citations omitted).[2]

Where an ALJ does not assign "controlling weight" to a treating physician's opinion, they must "consider certain factors to determine how much weight to give it, and should articulate 'good reasons' for the weight given." *See Camille v. Colvin*, 652 F. App'x. 25, 27 (2d Cir. 2016) (summary order) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1998) (requiring an ALJ to "provide a claimant reasons when rejecting a treating source's opinion"); *Schrack v. Astrue*, 608 F. Supp. 2d 297, 301 (D. Conn. 2009) ("The regulations further provide that even if controlling weight is not given to the opinions of the treating physician, the ALJ may still assign some weight to those views, and must specifically explain the weight that is actually given to the opinion.").

The treating physician's opinion, however, is not afforded controlling weight where "the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran*, 362 F.3d at 32.

---

[2] On March 27, 2017, new regulations took effect that effectively abolish the treating physician rule; for claims filed before March 27, 2017, however, the treating physician rule continues to apply. *See* 20 CFR § 416.927; *Smith v. Comm'r of Soc. Sec. Admin.*, 731 F. App'x. 28, 30 n.1 (2d Cir. 2018) (summary order).

"[T]o override the opinion of the treating physician," the ALJ must consider, under the relevant regulations, factors including "(1) the frequently, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129). "'An ALJ does not have to explicitly walk through these factors, so long as the Court can conclude that the ALJ applied the substance of the treating physician rule[.]'" *London v. Comm'r of Soc. Sec.*, 339 F. Supp. 3d 96, 102 (W.D.N.Y. 2018) (quoting *Scitney v. Colvin*, 41 F. Supp. 3d 289, 301 (W.D.N.Y. 2014)). The ALJ "must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" *Burgess*, 537 F.3d at 129 (quoting *Halloran*, 362 F.3d at 33 and citing 20 C.F.R. § 404.1527(d)(2)).

As part of the ALJ's affirmative duty to develop the administrative record, "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa*, 168 F.3d at 79. There are, however, cases where the treating physician should not be provided controlling weight. *See, e.g.*, *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (holding that "the option of treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in support, such as the opinions of other medical experts").

Mr. Dolcetti argues that the ALJ improperly gave the greatest weight to Dr. Cohen—who examined Mr. Dolcetti only once—at the expense of Dr. Daras—who has actively treated Mr. Dolcetti since May 2014. Mot. to Reverse at 24. Even then, the neuropsychological testing results used by the ALJ to find medical improvement were similar to earlier assessments. *Id.* at 24. And Mr. Dolcetti's testing performance was highly dependent on the length of time he was

required to sustained focus, the time of day, and his pain level. *Id.* at 25. Based on the controlling weight that Dr. Daras's opinion should have been granted as Mr. Dolcetti's treating physician and Dr. Wacker's cognitive examination of Mr. Dolcetti, Mr. Dolcetti contends that the ALJ's conclusion of medical improvement beyond a disability is unsupported. *Id.* at 25–29.

In response, the Commissioner argues that the treating physician evidence is not absolute and the ALJ reasonably weighed the evidence. Mot. to Affirm at 9. Because Mr. Dolcetti maintained average to above average cognitive functioning and improved his functioning, the Commissioner argues that he was able to perform substantially gainful activity. *Id.* at 10–12. Based on Dr. Cohen's evaluation of and review, Mr. Dolcetti's condition would eventually return to normal and would not be severe as of January 2, 2016. *Id.* at 12.

The Court disagrees.

Here, the ALJ gave partial weight to Dr. Daras's July 23, 2015 and March 2, 2016 medical opinions, little weight to his September 30, 2016 medical opinion, and no stated weight to his May 23, 2016 and September 30, 2016 opinions. Tr. at 23. Instead, the ALJ gave great weight to the consultative examination of Dr. Cohen on October 17, 2014. *Id.* Although Dr. Daras was Mr. Dolcetti's treating physician and a neurologist, the ALJ chose to assign the greatest evidentiary weight to the opinion of someone who gave Mr. Dolcetti one psychological examination.

The Second Circuit has cautioned ALJs from "rely[ing] heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419; *see Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) (justifying giving a consultative physician limited weight "because 'consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.

Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons'") (quoting *Torres v. Bowen*, 700 F. Supp. 1306, 1312 (S.D.N.Y. 1988)). At the same time, "the report of a consultative physician may constitute [substantial] evidence." *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983); *see also Prince v. Astrue*, 490 F. App'x. 399, 401 (2d Cir. 2013) (summary order) ("consultative examinations were still rightly weighed as medical evidence"); *Petrie v. Astrue*, 412 F. App'x. 401, 405 (2d Cir. 2011) (summary order) ("the report of a consultative physician may constitute . . . substantial evidence").

In this case, however, Dr. Cohen's is neither conclusive as to Mr. Dolcetti's recovery timeline nor consistent with the other medical examinations within the record. Dr. Cohen opined that Mr. Dolcetti "is most likely going to return to a usual level of cognitive and intellectual performance" during his psychological evaluation. Tr. at 572. But Dr. Cohen never provided a timeline for this recovery sufficient to support the ALJ's January 2, 2016 determination that Mr. Dolcetti was no longer disabled. *Compare* Tr. at 564–73, *with* Tr. at 23, 28. The opinion also has limited applicability because, according to the ALJ's own conclusions, Mr. Dolcetti was disabled from April 4, 2014 through January 1, 2016, *see* Tr. at 27; thus, Dr. Cohen's testimony does not provide substantial evidence of Mr. Dolcetti's disability as much as it confirms it may end at some point in the future.

Dr. Daras, Mr. Dolcetti's treating physician and neurologist, states in his September 30, 2016 medical opinion that ongoing medical issues resulting from Mr. Dolcetti's encephalopathy would require him to take unscheduled breaks two or three times during an eight-hour workday, with the rest periods ranging from one to three hours. Tr. at 640. And Mr. Dolcetti would likely be absent from work more than four times per month. *Id.* at 641. Just as importantly, Dr. Daras

noted that Mr. Dolcetti had "[p]oor concentration and cognitive function after prolonged activity," making it difficult for him to work. *See* Tr. at 647.

Moreover, the only other medical opinions in the record, which the ALJ gave no stated weight, also support Dr. Daras's conclusions.

In November 2014, after a neuropsychological evaluation by Dr. Wacker, Mr. Dolcetti's high cognitive outputs were limited to "time-limited intervals in a quiet and distraction-free environment, not exceeding 45 to 60 minutes" and it was suggested that he only schedule work "during his most alert times of the day and should be followed by periods of brain rest." Tr. at 582. After the exam, Dr. Wacker concluded that "full-time work and commuting are not recommended at this time." *Id.*

After a second neuropsychological evaluation in July 2016, Dr. Wacker stated that Mr. Dolcetti also continued to display a "mildly disconjugate gaze, photophobia, intermittent nystagmus and poor balance." Tr. at 115. He also continued to have "sound concentration toward the beginning of each session," but "his focus deteriorated rather quickly with sustained cognitive demands of lengthy testing sessions." *Id.* While Mr. Dolcetti was able to attend to, learn, and retain new information, reason abstractly, and problem solve quickly, his cognitive performance "remain[ed] significantly impacted by time of day, pain level and length of time sustained focus is required, with much poorer cognitive output during afternoon sessions and toward the end of sessions." *Id.* at 118.

Dr. Wacker suggested that Mr. Dolcetti "continue engagement in work-related tasks for time-limited intervals in a quiet and distraction-free environment, not exceeding 60 to 120 minutes at a time." *Id.* In short, "[c]entral nervous system compromise leaves him easily overstimulated and vulnerable to fatigue with limited attentional services," so a "[r]eturn to full-

time work and commuting [were] not appropriate for Mr. Dolcetti." *Id.* at 119.

In sum, Dr. Cohen's testimony speaks only to the likelihood of Mr. Dolcetti's future psychological improvement during the period the ALJ determined Mr. Dolcetti was disabled. But the opinions of the treating physician and neurocognitive examinations that span the course of Mr. Dolcetti's encephalopathy are given either partial, little, or no stated weight by the ALJ. Because affording such weight to Dr. Cohen "compounds risk of error in putting too much weight on this particular fractured medical opinion," *see Lugo Rodriguez v. Berryhill*, No. 3:17-cv-00093 (VLB), 2018 WL 1135330, at *7 (D. Conn. Mar. 2, 2018), the Court finds that the ALJ erred in providing "great weight" only to a portion of the consultative examiner's opinion. *See Selian*, 708 F.3d at 418-19 (criticizing the ALJ's characterization of medical experts' "conflicting" evidence when the record instead demonstrated the medical opinions appeared to concur).

Accordingly, the Court reverses the Commission's administrative decision and remands the case for further proceedings. *See Schaal*, 134 F.3d at 504 (finding that when there is a reasonable basis to doubt the ALJ applied the correct legal principles, the Court "cannot be certain whether or not the Commissioner's ultimate conclusion that plaintiff was not disabled is supported by substantial evidence"); *Rosa*, 168 F.3d at 79 ("an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.").

### C.     ALJ's Step Five Findings

After a claimant has proved that his or her residual functional capacity precludes a return to past relevant work, Step Five shifts the burden to the Commissioner "to show there is other work that [the claimant] can perform." *Brault v*, 683 F.3d at 445. The ALJ may meet its burden

"either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." *McIntyre*, 758 F.3d at 151. "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence, and accurately reflect the limitations and capabilities of the claimant involved." *Calabrese v. Astrue*, 358 F. App'x. 724, 276 (2d Cir. 2009) (summary order) (internal citations omitted). To meet the burden of Step Five under the Social Security regulations, "[t]he Commissioner need show only one job existing in the national economy that [Claimant] can perform." *Bavaro v. Astrue*, 413 F. App'x. 382, 384 (2d Cir. 2011) (summary order) (citing 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1566(b)).

Mr. Dolcetti argues that the *Selected Characteristics of Occupations* used by the vocational expert facially precludes two of the three jobs suggested for Mr. Dolcetti and the underlying methodology was flawed. Mot. to Reverse at 31. In his view, the vocational expert improperly concluded that the stock laborer and product assembly positions did not require depth perception; rather, both positions require frequent depth perception, which prohibits Mr. Dolcetti from full-time employment in either role. *Id.* at 30.

Moreover, Mr. Dolcetti argues that the laundry work position is not an occupation defined within the *Dictionary of Occupational Titles* and any job in that field would likely require use of laundry equipment. *Id.* at 31–32. Finally, the vocational expert did not cite a single source upon which he could have relied on for his job incidence testimony. *Id.* at 33. Because the vocational expert relied on questionable job information that directly contradicts the treating physician testimony of Dr. Daras, Mr. Dolcetti argues that it cannot form the substantial evidence necessary for the ALJ's step-five residual functional capacity finding. *Id.* at 34–37.

In response, the Commissioner argues that Mr. Dolcetti has no support for the contention

that his ability to tolerate noise, or perform reaching, standing, or walking be different from the ALJ's conclusion that Mr. Dolcetti had no limits on reaching, standing, or walking and only mild noise restrictions. Mot. to Affirm at 14. The Commissioner argues that there is nothing to show that a reasonable factfinder would be compelled to find greater limitations than those assumed for the residual functional capacity determination by the vocational expert. *Id.* at 15.

Because there is substantial evidence that Mr. Dolcetti's condition improved to the point where he could perform unskilled work, the Commissioner asserts that the ALJ's residual functional capacity conclusion should be upheld. *Id.* Finally, even if there was an issue with the vocational expert's residual functional capacity determination for assembly work or a stock laborer, the laundry worker job—by itself—is sufficient to find that Mr. Dolcetti is no longer precluded from full-time work. *Id.* at 16. And there was no cross-examination of the vocational expert or a showing of coercion or deception to find that he relied on improper source material to inform his conclusion. *Id.* at 17–19.

The Court disagrees.

When evaluating a Social Security determination, "[t]he Commissioner has the burden in step five of the disability determination to prove that the claimant is capable of working." *Bavaro*, 413 F. App'x. at 384. At Step Five, the ALJ must determine whether the claimant can do "other work existing in significant numbers in the national economy" based on the claimant's residual functional capacity. *Greek*, 802 F.3d 373 n.2 (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). Sufficient "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which [the claimant is] able to meet with [her] physical or mental abilities and vocational qualifications." 20 C.F.R. § 416.966 (b). In its evaluation "[a]n ALJ may rely on a vocational expert's testimony regarding a

hypothetical as long as there is substantial evidence to support the assumptions upon which the vocational expert based his opinion and accurately reflect the limitations and capabilities of the claimant involved." *See McIntyre*, 758 F.3d at 151 (internal citations and quotation marks omitted). The Commissioner cannot meet its burden when there are only "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where" the claimant lives. 20 C.F.R. § 416.966 (b).

There are two errors with the ALJ's use of a vocational expert at Step Five.

First, the ALJ did not account for claimant's functional limitations that are supported by the record. In order "for the testimony of a vocational expert to be considered reliable, the hypothetical posed must include all of the claimant's functional limitations, both physical and mental supported by the record." *Harbock v. Barnhart*, 210 F. Supp. 2d 125, 134 (D. Conn. 2002) (Goettel, J.) (citation omitted). And "an ALJ's hypothetical should explicitly incorporate any limitations in concentration, persistence, and pace." *McIntyre*, 758 F.3d at 152. When "the ALJ asks the vocational expert a hypothetical question that fails to include or otherwise implicitly account for all of the claimant's impairments, then the vocational expert's testimony is not substantial evidence and cannot support the ALJ's conclusion that the claimant can perform significant numbers of jobs in the national economy." *Hernandez v. Berryhill*, No. 3:17-cv-368 (SRU), 2018 WL 1532609, at *18 (D. Conn. 2018) (internal quotation marks and citation omitted).

Here, the ALJ's conclusion did not account for Mr. Dolcetti's concentration, pace, and persistence limitations. During his vocational expert testimony, Mr. Durval testified that inability to concentrate for two hours, possible absenteeism rates of three or four days each month, and requiring an unscheduled one-hour break at work were individually disqualifying impediments

for full-time work—let alone when compounded together. *See* Tr. at 86–88. Yet Mr. Dolcetti

testified that these were all limitations to his day-to-day living, which Dr. Daras corroborated. Tr.

at 50–63; Tr. at 642–47.

An ALJ's failure to incorporate non-exertional limitations supported by the medical

record will be harmless error if "(1) medical evidence demonstrates that a claimant can engage in

simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace

and the challenged hypothetical is limited to include only unskilled work; or (2) the hypothetical

otherwise implicitly accounted for a claimant's limitations in concentration, persistence, and

pace." *McIntyre*, 758 F.3d at 152. But neither of those exceptions are present here. Such a

finding by the ALJ in this case would be contrary to the substantial evidence because the ALJ

here never determined whether Mr. Dolcetti's pain and work limitation testimony was credible.

The ALJ also ignored the vocational expert's testimony that limitations that Mr. Dolcetti

described during his testimony would yield no available jobs.

In the Second Circuit, a non-exertional "impairment is non-negligible 'when it . . . so

narrows a claimant's possible range of work as to deprive him of a meaningful employment

opportunity.'" *Selian*, 708 F.3d at 421 (citing *Zabala v. Astrue*, 392 F.3d 402, 411 (2d Cir.

2010)). Based on the vocational expert's testimony, *see* Tr. at 86–88, Mr. Dolcetti's non-

exertional limitations were non-negligible. Accordingly, "because a vocational expert in this case

testified that [claimant] could perform no jobs available in large numbers in the national

economy if he had to miss four or more days of work per month, the ALJ's failure to provide

adequate reasons for rejected [the treating physician]'s opinion was not harmless." *Greek*, 802

F.3d at 376 (internal citation omitted).

Second, the substantial evidence does not support the ALJ's Step Five analysis that there

were significant jobs that Mr. Dolcetti could perform. The ALJ's finding that "[b]eginning on January 2, 2016" there were "jobs that existed in significant numbers in the national economy that the claimant could perform," *see* Tr. at 26–27, was not supported by the substantial evidence in the record. To the contrary, the ALJ's conclusion is inconsistent with every other medical opinion in the record, except for Dr. Cohen, whose opinion should have been given little weight for the reasons discussed above. Because no other evidence supports the ALJ's determination on the number of jobs available to Mr. Dolcetti, the finding that he is no longer disabled is "not supported by substantial evidence in the record." *See Greek*, 802 F.3d at 374–75.

### D. Remand

As the Second Circuit has noted, "[w]here application of the correct legal standard could lead to only one conclusion, we need not remand." *Schaal v. Apfel*, 134 F.3d at 504; *see also Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980) ("[W]e have reversed and ordered that benefits be paid when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose."). Given the Court's determination about Step Five, only one outcome is possible: the "record is clear that if the opinion of plaintiff's treating physician controls, there are no jobs in the national economy that plaintiff can perform." *Morris v. Berryhill*, 313 F. Supp. 3d 435, 441(W.D.N.Y. 2018). "As such, additional proceedings would serve no proper purpose, and remand for the calculation and payment of benefits is warranted." *Id.*; *see also Torres v. Colvin*, No. 3:16-cv-809 (JAM), 2017 WL 1734020, at *3 (collecting cases remanding for calculation of benefits only where Commissioner does not meet Step Five burden).

Given the record and the deficiencies in the ALJ's decision identified above, rehearing is not warranted, and instead, this case will be remanded solely for the calculation and payment of benefits.

**IV.     CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Mr. Dolcetti's motion to reverse the decision of the Commissioner and **DENIES** the Commissioner's motion to affirm.

The Court also **REMANDS** the case solely for the calculation and payment of benefits.

Finally, the Court **DIRECTS** the Clerk of the Court to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 7th day of June 2019.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE